IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

03 MAY 27 AM 11: 43

U. . . . . . RT
N.U. . . . . . AMA

CURTIS IVY,                          )

    PLAINTIFF,                       )

VS.                                  )          CV-01-H-3096-S

TUSCALOOSA STEEL CORPORATION,        )

    Defendant.                       )

**ENTERED**

**MAY 2 7 2003**

## MEMORANDUM OF DECISION

The court has before it the December 20, 2002 motion of defendant Tuscaloosa Steel Corporation for summary judgment. Pursuant to the court's December 26, 2002 order, the motion was deemed submitted, without oral argument, on January 23, 2003.

### I. Procedural History

Plaintiff Curtis Ivy commenced this action on December 4, 2001 by filing a complaint in this court, asserting claims under 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. and the Family Medical Leave Act ("FMLA"), alleging race discrimination with respect to promotion, job assignment and retaliation and deprivation of rights secured by the FMLA. Specifically, plaintiff alleges that defendant discriminated against him in terms of promotion and advancement opportunities because of his race and that defendant retaliated against him for complaining about racial



discrimination. Defendant's December 20, 2002 motion for summary judgment asserts that plaintiff has failed to establish a prima facie case for any of plaintiff's claims and defendant is therefore entitled to summary judgment as a matter of law.

Both parties have filed briefs and submitted evidence in support of their respective positions. Defendant submitted evidence[1] for its motion and filed a supporting brief on December 20, 2002. On January 16 and 17, 2003 plaintiff filed evidence[2] in opposition to defendant's motion. On January 23, 2003 plaintiff filed a brief in opposition to defendant's motion, and on February 10, 2003, defendant filed a reply brief. Plaintiff

---

[1] Defendant submitted: excerpts from the deposition of Curtis Ivy; excerpts from the deposition of Aubrey Wilson; affidavit of Andrew Carver with attached exhibits; 8 visits of doctor's notes for Curtis Ivy; affidavit of Jeffrey Morrow; Curtis Ivy NLRB charge; excerpts from deposition of Andrew Carver.

[2] Plaintiff submitted: deposition of Colin Muncie with attached exhibits; deposition of Aubry Wilson with attached exhibits; deposition of Andrew Carver with attached exhibits; employee handbook; work memo from Jane Tapper to Andrew Carver; statement of Thomas Scott; return to work certificate; disciplinary action sheet for Curtis Ivy; Catastrophic/STD Form for Curtis Ivy; work memo from Melissa Dotson to Andrew Carver; work memo from Jane Tapper to David Smart; DCH Emergency Room notes; excerpts from employee handbook; Caster Team Leader position description; Hot Mill Team Leader position description; Plate Finishing CTL Team Leader position description; 2001 Employee Opinion survey; exhibit 10 from Carver deposition; Interview Assessment Form; Employee List; Invoices submitted to Tuscaloosa Steel of Curtis Ivy's medical treatment; Explanation of review forms for Curtis Ivy's medical treatment; Curtis Ivy's April Job Offer; Health Insurance Claim; Disciplinary Action Form for Curtis Ivy; Curtis Ivy Employee Appraisal; Personnel File for Brian Matthews; Personnel File for Tim Nelson; Personnel File for Jeffrey Johnson; Curtis Ivy Deposition.

filed a reply on February 13, 2003.

## II. Standards for Evaluating a Summary Judgment Motion

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. See id. at 323. Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. See id. at 324.

The substantive law will identify which facts are material and which are irrelevant. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. See Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such

that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  See id. at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial.  See Fitzpatrick, 2 F.3d at 1115-17 (citing United States v. Four Parcels of Real Property, 941 F.2d 1428 (11th Cir. 1991)(en banc)).  If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial.  See Fitzpatrick, 2 F.3d at 1115.  Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways.  First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial.  Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence

4

sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to _affirmatively_ show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question.  This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the non-moving party's case.  See Fitzpatrick, 2 F.3d at 1115-16.  If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts.  See Lewis v. Casey, 518 U.S. 343, 358 (1996) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)).

### III. Relevant Undisputed Facts[3]

Plaintiff Curtis Ivy, an African-American male, began working for Tuscaloosa Steel Corporation on May 20, 1996 in the Casting department as a caster. (See Pl.'s Depo. at 24.) He has continued to work the same position at all times relevant to the complaint although his job title changed in January 2000. (See id; see also Wilson Depo. at 22.)

In January 2000, Tuscaloosa Steel revamped their organizational structure and grouped employees in the casting department into two categories: Team Member I or Team Leader. (See Wilson Depo. at 22.) Thus, Tuscaloosa Steel eliminated the different position titles in the department such as caster, assistant discharge operator, discharge operator, caster controller and scheduler, and now designated employees simply as a Team Member I or Team Leader. (See id.)

#### A. Team Leader

After changing the designation of these positions, Tuscaloosa Steel proceeded to choose the Team Leader for each crew of Team Members.[4]  Pursuant to company policy, a panel of

---

[3] Facts are undisputed unless otherwise expressly noted.  If the facts are in dispute, they are stated in the manner most favorable to the plaintiff.  See Fitzpatrick, 20F.3d at 1115.

[4] Each employee who worked in the Casting department prior to the change in organizational structure was grandfathered in as a Team Member I. (See Wilson Depo. at 22-23, 33.)  The team leader was chosen from those who were now Team Members. (See Wilson Depo. at 23.)

three managers, Aubrey Wilson,[5] Craig Hamner and Eugene Hunter,
interviewed candidates for the position of Team Leader, although
Wilson made the final decision.[6] (See id at 54.)  The managers
looked at previous job experience, attendance, job performance
and safety habits as the criteria to choose the team leader. (See
id.) Length of service was also an important consideration for
selecting the team leader. (See Carver Affidavit, Def. Ex. 3.)
The panel spoke with each applicant's manager before choosing the
team leader. (See Wilson Depo. at 52.) After reviewing at least
seven applicants, Wilson ultimately chose Roy Grose[7], Jeff

_____

[5] Aubrey Wilson was the manager of the casting department.
(See Wilson Depo. at 18.)

[6] Plaintiff stated that he applied for the team leader
position by telling Tom Sullivan, while the two were in the
basement, that his ambition was to be a Team leader. (See Pl's
Depo at 172-74.) Plaintiff stated that Sullivan then interviewed
him for the position. (See id. at 179.) Plaintiff also stated
that Aubrey Wilson knew of plaintiff's interest in being a team
leader.  Although there is no written documentation of his
application for this position, and Aubrey Wilson testified that
plaintiff did not apply, the court will assume that plaintiff's
oral statement of ambition was an application for the position.
(See id at 174; see also Aubrey Wilson Depo. at 34.)

[7] Roy Grose was hired by Tuscaloosa Steel on August 19,
1986, ten years prior to plaintiff. (See Carver Affidavit, Def.
Ex. 3) From 1997 until the interviews, Grose was employed as Head
Caster. (See id.)  Eugene Hunter, Grose's manager, told Aubrey
Wilson Grose had worked in the slab yard. (See Wilson Depo. at
53.) Hunter also stated Grose was very organized and detailed in
work methods. (See id.) Grose has been to England to receive
training in liquid casting. (See Pl.'s Depo. at 185.)  Grose had
no history of attendance problems . (See Wilson Depo. at 59.)

7

Morrow[8], Todd Cooley[9] and Wayne Smelley[10] as team leaders, all of whom are white. Plaintiff claims that he did not receive the position because of his race. Plaintiff admits that he had forgotten to come to work for his shifts in the past and discussed his attendance problems with Aubrey Wilson. (See Pl.'s Depo. 211-12, 215.)  Plaintiff believes that he should have received the Team Leader position because he "went through a very good AIDT[11] training for several weeks and [he] comprehended everything that was given to [him]." (See Pl.'s Depo. at 182.) Plaintiff did not file a complaint with anyone at Tuscaloosa

---

[8] Jeff Morrow was hired by Tuscaloosa Steel on August 26, 1991, five years prior to plaintiff. (See Carver Affidavit, Def. Ex. 3.)  From May 1996 until the interview, Morrow was also employed as a Head Caster and had prior experience in the Hot Mill. (See id.) Morrow had been to England to receive training in liquid casting. (See Pl.'s Depo. at 185.) Morrow had no history of attendance problems. (See Wilson Depo. at 59.)

[9] Todd Cooley was hired on March 21, 1988, eight years prior to plaintiff. (See Carver Affidavit, Def. Ex. 3.) From October 1996 until the interviews, Cooley was also employed as a Head Caster. (See id.) Cooley had been to England to receive training in liquid casting. (See Pl.'s Depo. at 185.) Cooley had no history of attendance problems. (See Wilson Depo. at 59.)

[10] Wayne Smelley was hired by Tuscaloosa Steel on March 30, 1992, four years prior to plaintiff. (See Carver Affidavit, Def. Ex. 3.) From 1997 to the interviews, Smelley was employed as Caster Controller and had prior experience in the Hot Mill. (See id.)  Smelley had been to England to receive training in liquid casting. (See Pl.'s Depo. at 185.) Smelley had no history of attendance problems. (See Wilson Depo. at 59.)

[11] Plaintiff did state, however, that he did not know whether the others who received the Team Leader position had undergone AIDT training.  AIDT training consisted of testing on basic math skills, metallurgy and other aspects of casting (See Pl.'s Depo. at 181-83.)

Steel about not receiving the Team Leader position.  (See id. at 191.)

**B. Step-Up Team Leader**

Under the new organizational structure at Tuscaloosa Steel, when a team leader is absent from work, the leader chooses a step-up team leader to fill his spot. (See Pl.'s Depo. at 197; see also Wilson Depo. at 134.) The step-up team leader receives team leader pay while performing in the leader's role. (See Pl.'s Exhibit 28.)

Jeff Morrow, plaintiff's team leader, planned to take a vacation and designated Jeff Johnson to be his step-up leader in his absence. (See Pl.'s Depo. at 198.) Johnson declined to take on the position and Jeff Morrow chose Tim Nelson to be the step-up team leader. (See id.)  Plaintiff claims that he had requested this position and was denied the position because of his race. (See Compl. ¶10.)

Plaintiff states Aubrey Wilson told him that he would not receive the step-up position because of his work with the union and reports that he had shoddy paperwork and was sleeping on the job.[12] (See Pl.'s Depo. at 201-203.)  Although plaintiff admits

---

[12] Aubrey Wilson stated the only conversation he had with plaintiff about this position involved a request by plaintiff to be a step-up leader "one day." (See Wilson Depo. at 139.) Wilson told plaintiff that he needed to work on his attendance before he would be considered for the position but Wilson did not ultimately decide whether plaintiff would become a step-up leader. (See id.) Rather, Jeff Morrow stated that he denied the

that Wilson never made any statement that indicated race was a factor in denying the position, plaintiff believes that Wilson's reason for not giving him the position was his race.[13] (See id. at 208-09.)

### C. Assigning Light Duty

Plaintiff suffered an injury to his head on March 11, 2001. (See Medical Record, Def. Evid. Sub. Ex. 4.) Plaintiff was diagnosed with a closed head injury and contusions to the head. (See Pl. Evid. Sub. Ex. 6.) On March 12, 2001, plaintiff was declared unable to work by his attending physician. (See id.)  On March 15, 2001 plaintiff was again declared unable to work and the physician noted complaints of dizziness. (See Medical Record, Def. Evid. Sub. Ex. 5.) On March 19, plaintiff's physician restricted his work only to office or seated work, but on March 26, plaintiff complained again of dizziness and his physician again declared him unable to work due to positional vertigo. (See

_____

position to plaintiff because of plaintiff's attendance problems and failure to call in on days he would be absent. (See Morrow Affidavit, Def. Evid. Sub. Ex. 12.) Plaintiff admitted that forgetting to come to work was not a good leadership trait. (See Pl.'s Depo. at 215.)

[13] Interestingly, in a sworn statement before the United States National Labor Relations Board (NLRB), plaintiff stated that management discriminated against him because of his activities "on behalf of the United SteelWorkers of America by making me rotate work assignments among junior employees and by denying [him] the opportunity to serve as Acting Team Leader during Jeff Morrow's absence." (See Def. Evid. Sub. Ex. 13.) There is no mention in that charge of any discrimination for race.

Medical Records, Def. Evid Sub. Ex.'s 6 & 7.)  On March 28, plaintiff was again released to work under restrictions[14] but was deemed to be fully capable to work without restrictions on April 4, 2001. (See Medical Records, Def. Evid. Sub. Ex.'s 8 & 9.)  On April 24, plaintiff returned to his physician complaining of persistent dizziness and was again declared unable to work. (See Medical Records, Def. Evid. Sub. Ex. 10.)  On May 10, 2001 plaintiff returned to his physician and was released with the restrictions that he avoid elevated platforms, heights and ladder climbing and was approved for janitorial work. (See Medical Records, Def. Evid. Sub. Ex. 11.)

On the days the doctor permitted plaintiff to work after his injury and after May 10, 2001, plaintiff worked in the administrative offices for Tuscaloosa Steel putting together material data sheets and did paperwork in security office. (See Pl.'s Depo. at 275-76.) Plaintiff alleges that he should have been allowed to work the computers in the torch pulpit but was denied the opportunity by Aubrey Wilson because of his race.[15]

---

[14] Plaintiff was restricted from lifting more than 30 pounds, using his right hand for grasping, pulling or pushing and was to refrain from climbing ladders and working at unprotected heights. (See Medical Records, Def. Evid. Sub. Ex. 8.)

[15] The court has found some difficulty understanding exactly what type of light duty plaintiff complains he did not receive. Based on his own deposition testimony, plaintiff admits that he was given light duty in the administrative offices and security offices by Melissa Dodson. However, he seems to allege he should have been given a post in the pulpit by Aubrey Wilson. (See Pl.'s Depo. at 273.)

(See Compl; see also Pl.'s Depo. at 265,272, 286.)

The pulpit operator works in a booth several feet above the casters and monitors at least six computer screens. (See Pl.'s Depo. at 71-72.) The operator is responsible for monitoring various operations that cannot be monitored from the casting floor. (See id. at 73.) This position requires constant alertness and the slightest deviation could lead to death. (See id. at 74, 78.) In fact, if the mold water levels are not monitored correctly, it could lead to "a small hydrogen bomb and it would blow up and the guys on the mold would get hurt." (See id. at 73.)  If the pulpit operator does not critically monitor the computers, he places the workers' lives in danger. (See id. at 78.)

Plaintiff states that two other white employees, Brian Matthews and Mike Brown, were injured on the job and were assigned to the pulpit operator as their light duty assignment. (See Pl.'s Depo. at 272-73.)  Mike Brown's injury was a broken foot. (See id.) Brown's physician restricted him to no excessive walking, standing or heavy lifting. (See Medical Record of Mike Brown, Def. Evid. Sub. Ex. 3.) Brown did not complain of dizziness or any type of head injury. (See id; see also Carver affidavit, Def. Evid. Sub. Ex. 3.) Brian Matthews' injury was a back injury.[16]  (See Medical Records of Brian Matthews, Def.

_____

[16] Plaintiff states that Matthews' had "his guts split open." (See Pl.'s Depo. at 271.) Brian Matthews' medical records

12

Evid. Sub. Ex.3.) Matthews' physician restricted him to light
duty for four days and then allowed him to resume work. (See id.)
Matthews also did not complain of any dizziness or any type of
head injury. (See id; see also Carver affidavit, Def. Evid. Sub.
Ex. 3.)

### D. FMLA Claim

Plaintiff's head injury continued to bother him until at
least August, when he was also diagnosed with a thyroid
condition. (See Pl.'s Depo. at 334.)  The thyroid condition,
coupled with the remnants of the head injury, made him feel too
sick to come into work. (See id. at 242.)  Plaintiff stated that
he was still dizzy and his thyroid was "out of whack." (See id.
at 244.) In fact, plaintiff felt too sick to even read a book,
especially the Tuscaloosa Steel Handbook. (See id.) Plaintiff's
attending physician, Dr. Scott, declared plaintiff unable to work
beginning August 15, 2001. (See Pl.'s Evid. Sub. Ex. 6.)

Plaintiff did not come to work from August 16, 2001 to at
least September 24, 2001. (See Discipline Sheet, Pl. Evid. Sub.
Ex. 8.)  Moreover, plaintiff did not call everyday to inform his
manager that he would be absent from his shift because he "didn't

_____

only indicate a back injury during the time he was given light
duty. (See Medical Records of Brian Matthews, Def. Evid. Sub. Ex.
3.)

feel like calling everyday."[17] (See Pl.'s Depo. at 236.)   The
Tuscaloosa Steel Employee Handbook received by plaintiff on
August 10, 2001, states "You must also keep your manager informed
of continuous absence if you are not able to immediately return
to work." (See Employee Handbook, pg.17, Pl. Evid. Sub. Ex. 4.)

Plaintiff's doctor sent an illegible[18] fax to Andrew Carver
on August 21, 2001 that indicated he was not coming into work.
(See Pl.'s Depo. at 240.)   Plaintiff adamantly states that
Tuscaloosa Steel knew where he was during the absence even though
he did not call everyday, and they also knew his return date was
uncertain since he never called to give them one.[19] (See id. at
240-41.)

On August 31, 2001 Andrew Carver sent plaintiff a letter
that stated the following:

> You have not attended work since August 16, 2001.
> As of today, you have missed scheduled workdays on
> August 20, 21, 24, 25, 26, 29 and 30.  Per the Corus
> Tuscaloosa Employee Handbook that you acknowledged

---

[17] The defendants state that plaintiff never called in to
inform his manager or human resources that would be absent from
work. (See Letter, Def. Evid. Sub. Ex. 3.) Plaintiff states that
he did call at least once. (See Pl.'s depo. at 247.)

[18] Andrew Carver stated that he repeatedly tried to call the
Doctor's office for another copy of the fax that was legible and
the doctor would not speak with him. (See Carver Depo. at 114.)
The fax only indicated it was from a doctor's office and had
plaintiff's name on the top. (See id.)

[19] The defendant states that they never knew whether
plaintiff abandoned his position since he never called to inform
anyone of his condition. (See Carver Depo. at 114-15.)

14

receipt of on August 10, 2001, you are clearly in violation of the tardiness and attendance policy. The policy states: "You must keep your manager informed of continuos absence if you are not able to immediately return to work." Your area manager, Jane Tapper, has yet to hear from you in regards to your continuous absence and this is a clear violation of that policy. The Human Resources Department received a fax from Dr. Scott on August 21 authorizing short-term disability benefits for you from August 16 to an unknown date. The document states that you absence is due to a work-related ailment, although the Company's attending physician released you to work from your alleged work related injury. Per the handbook that you acknowledged receipt of on August 10, 2001 you are clearly in violation of the Disability Insurance Policy. The policy is as follows: "Disability income benefits are available to employees who qualify. This benefit is to protect your income if it becomes necessary for you to be off work due to illness or injury that occurs unrelated to work. On-the-job injuries will be treated under the worker's compensation policy. The manager of Human Resources must approve all disability claims." Your claim for Short-term disability benefits from an alleged on-the-job injury is a clear violation of that policy. Around 3:00 pm Thursday August 31, 2001, I contacted someone claiming to be your mother at phone #345-3936. She said that you did not have a phone and she would give you the message to call me. If you do not contact me by Tuesday September 4, I will assume that you have voluntarily resigned from your employment with Corus Tuscaloosa.

(See Letter, Def. Evid. Sub. Ex. 3.)

Plaintiff claims that this letter was harassment and was in violation of the FMLA.[20] (See Pl.'s Depo. at 244; see also Compl.

---

[20] First, plaintiff states in his complaint that the defendants violated the FMLA by terminating him. (See Compl. ¶19) However, on December 4, 2001, the date the complaint was filed, plaintiff was still employed by Tuscaloosa Steel. (See Compl; see also Pl.'s Depo. at 22.) The plaintiff does state that the letter sent by Andrew Carver was harassment and that he was suspended for two days without pay because he was sick. The court will assume that this letter and his suspension is the basis for

¶17-19)  Upon returning to work, plaintiff was suspended for two days without pay. (See Pl.'s Evid. Sub. Ex. 8.)  In his disciplinary action sheet, Jane Tapper suspended plaintiff for failing to report to his manager that plaintiff would be absent for over a month. (See id.)  Plaintiff did not appeal this suspension and did not apply at any time for FMLA leave from Tuscaloosa Steel.  (See Pl.'s Depo at 299,337.) Plaintiff further claims, however, that he was suspended because he was black and not because he failed to call in sick. (See id. at 248-49.)

### IV. Applicable Substantive Law and Analysis

Plaintiff claims disparate treatment racial discrimination and retaliation under 42 U.S.C. § 1981.  Section 1981 provides that:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

---

plaintiff's FMLA claim. On a side note, Plaintiff's brief argues that the FMLA claim is centered around Tuscaloosa Steel's denial of a bonus to plaintiff as punishment for being sick. (See Pl.'s Opposition Brief at 19.) Since plaintiff submitted no other evidence to describe his FMLA claim, the court will rely on his deposition testimony that the letter from Andrew Carver was harassment and his suspension was in violation of the FMLA.

16

42 U.S.C. § 1981(a) (1994).[21]  The court is aware that the summary judgment rule applies in job discrimination cases just as in other cases.  <u>See</u> <u>Chapman</u>, 229 F.3d at 1025 (rejecting an earlier, contrary general rule and emphasizing that no thumb is to be placed on either side of the scale).

The analysis of the plaintiff's claims will be determined not only by the nature of the allegations but also by the quality of the evidence offered in support of those claims.  <u>See</u> <u>Standard</u>, 161 F.3d at 1330 (noting that "[t]he analytical framework and burden of production var[y] depending on the method of proof chosen").  In general, a plaintiff may attempt to establish a claim of illegal employment discrimination through the use of direct evidence, circumstantial (indirect) evidence, or statistics.  <u>See</u> <u>id.</u>; <u>see also</u> <u>Schoenfeld v. Babbitt</u>, 168 F.3d 1257, 1266 (11th Cir. 1999) (recognizing the availability of either direct or circumstantial evidence).  A plaintiff's ability to proceed through the use of circumstantial evidence of discrimination is necessarily important because direct proof of discrimination is uncommon.  <u>See</u> <u>Combs v. Plantation Patterns</u>, 106 F.3d 1519, 1537 (11th Cir. 1997); <u>Grigsby v. Reynolds Metals Co.</u>, 821 F.2d 590, 595 (11th Cir. 1987).  Direct evidence is

_____

[21]  The same framework long used to analyze claims under Title VII is also employed in assessing claims of employment discrimination under § 1981.  <u>See</u> <u>Standard v. A.B.E.L. Servs., Inc.</u>, 161 F.3d 1318, 1330 (11th Cir. 1998).

17

"[s]uch evidence [which], if believed, proves the existence of a fact in issue without inference or presumption." Burns v. Gadsden State Community College, 908 F.2d 1512 (11th Cir. 1990). Cf. Wright v. Southland Corp., 187 F.3d 1287, 1293-94 (11th Cir. 1999) (per Tjoflat, J.) (defining direct evidence as "evidence from which a reasonable trier of fact could find, more probably than not, a causal link between an adverse employment action and a protected personal characteristic" and finding the outcomes reflected in prior case law consistent with that definition); see also Bass v. Board of County Commissioners, Orange County, Florida, 242 F.3d 996, 1010 (11th Cir. 2001) (discussing meaning of "direct evidence" in the context of a Title VII race discrimination claim; "direct evidence" refers to a type of evidence which, if true, would require no inferential leap in order for a court to find discrimination."). "Direct evidence is composed of only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of some impermissible factor." Rojas v. Florida, 285 F.3d 1339, 1342, n.2 (11th Cir. 2001)(quoting Schoenfeld v. Babbitt, 168 F. 3d 1257, 1266 (11th Cir. 1999))(citations and quotations omitted). However, direct evidence does not include "stray remarks in the workplace" or "statements by nondecisionmakers" or "statements by decisionmakers unrelated to the decisional process itself." Price Waterhouse v. Hopkins, 490 U.S. 228, 277 (O'Connor, J.,

18

concurring) (1989); <u>see also</u> <u>EEOC v. Alton Packaging Corp.</u>, 901
F.2d 920, 924 (11th Cir. 1990) (quoting <u>Price Waterhouse</u>).

Here, plaintiff has presented only circumstantial evidence
of racial discrimination and retaliation. "In evaluating
[discrimination] claims supported by circumstantial evidence,
[the courts of this circuit] use the now-familiar framework
established by the United States Supreme Court in <u>McDonnell</u>
<u>Douglas Corp. v. Green</u>, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed.
2d 668 (1973), and <u>Texas Department of Community Affairs v.</u>
<u>Burdine</u>, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)."
<u>Combs</u>, 106 F.3d at 1527.  Under the <u>McDonnell Douglas</u> and <u>Burdine</u>
framework, the plaintiff first has the burden of establishing a
prima facie case of discrimination, which creates a rebuttable
presumption that the employer acted illegally.  <u>See</u> <u>id.</u> at 1527-
28.  The methods of presenting a prima facie case, as well as the
exact elements of the case, are not fixed; rather they are
flexible and depend to a large degree upon the facts of the
particular situation.  <u>See</u>, <u>e.g.</u>, <u>Nix v. WLCY Radio/Rahall</u>
<u>Communications</u>, 738 F.2d 1181, 1185 (11th Cir. 1984); <u>Lincoln v.</u>
<u>Board of Regents of Univ. Sys.</u>, 697 F.2d 928, 937 (11th Cir.
1983).  In general, a plaintiff establishes a prima facie case of
disparate treatment employment discrimination by showing that he
or she was a qualified member of a protected class and was
subjected to an adverse employment action but that otherwise

19

similarly situated employees outside the plaintiff's class were treated dissimilarly.[22] See McDonnell Douglas, 411 U.S. at 802 (hiring); Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997) (discipline); see also Nix, 738 F.2d at 1185 (discipline); Pittman v. Hattiesburg Mun. Separate Sch. Dist., 644 F.2d 1071, 1074 (5th Cir. 1981) (wages).

Once the plaintiff has shown a prima facie case and, thereby, has raised the presumption of discrimination, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions.[23] See Rojas, 285 F.3d at 1342; Combs, 106 F.3d at 1528. The employer "need not persuade the court that it was actually motivated by the proffered reasons." Burdine, 450 U.S. at 254-55; see Chapman, 229 F.3d at 1024. If the employer satisfies that burden by articulating one or more such reasons, then the presumption of discrimination falls and the burden of production again shifts to the plaintiff to offer evidence sufficient for a reasonable jury to conclude that the employer's supposedly legitimate reason is

_____

[22] See also McDonnell Douglas, 411 U.S. at 802 n.13 ("The facts necessary will vary in Title VII cases, and the specification above of the prima facie proof required from respondent is not applicable in every respect in different factual situations.").

[23] See Chapman, 229 F.3d at 1032 (A subjective reason is a legally sufficient, legitimate, nondiscriminatory reason if the defendant articulates a clear and reasonably specific factual basis upon which the employer based its subjective opinion.).

20

merely a pretext for illegal discrimination.[24]  Where the
defendant articulates multiple, reasonable, legitimate and
nondiscriminatory reasons, plaintiff must rebut each of
defendant's proffered reasons.  See Chapman, 229 F.3d at 1024-25.
Where plaintiff seeks to prove pretext by showing she was more
qualified than the person given the job or promotion, she "must
adduce evidence that the disparity in qualifications is 'so
apparent as virtually to jump off the page and slap you in the
face.'" Cofield v. Goldkist, Inc. 267 F.3d 1264, 1268 (11th Cir.
2001)(quoting Deines v. Texas Dept. of Protective and Reg.
Servs., 164 F.3d 277, 280 (5th Cir. 1999)).  Although the prima
facie case is irrelevant once the employer has offered a
legitimate reason for its actions, the evidence of pretext may
include the same evidence offered to establish the prima facie
case.  See Combs, 106 F.3d at 1528.

     Despite this shifting of the burden of production between
the plaintiff and the defendant under the McDonnell Douglas and
Burdine framework, "[t]he ultimate burden of persuading the trier
of fact that the defendant intentionally discriminated against
the plaintiff remains at all times with the plaintiff." Burdine,
450 U.S. at 253.  Given that the ultimate burden of persuasion

---

     [24] If the proffered reason is one that might motivate a
reasonable employer, a plaintiff cannot recast the reason but
must meet it head on and rebut it.  Simply quarreling with that
reason is not sufficient.  Chapman, 229 F.3d at 1030.

always lies with the employee, a plaintiff may prevail on an
employment discrimination claim and may also defeat a summary
judgement either by proving that intentional discrimination did
indeed motivate the defendant or by producing sufficient evidence
to allow a rational trier of fact to disbelieve the employer's
proffered legitimate reasons, thus permitting but not compelling
the trier of fact to make a finding of illegal discrimination.
See <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 120 S. Ct. 2097,
2108-09 (2000) (pointing out that the production of the necessary
sufficient evidence by plaintiff will not always prevent the
employer from prevailing on a Rule 50 motion and suggesting that
the strength of plaintiff's prima facie case, the probative value
of the proof that the employer's explanation is false, and any
other properly considered evidence that supports the employer's
case are among other factors to take into account in evaluating a
Rule 50 motion);[25] <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502
(1993); <u>Abel v. Dubberly</u>, 210 F.3d 1334, 1339 (11th Cir. 2000);
<u>Alexander v. Fulton County</u>, 207 F.3d 1303, 1336 (11th Cir. 2000);
<u>Combs</u>, 106 F.3d at 1529-38 (interpreting <u>Hicks</u> and the post-<u>Hicks</u>
case law); <u>Hairston v. Gainesville Sun Publ'g Co.</u>, 9 F.3d 913,
920-21 (11th Cir. 1993).

-------

[25] The court in <u>Chapman</u> modified the statement in <u>Combs</u>
contrary to this holding in <u>Reeves</u> after noting that the standard
for granting summary judgment mirrors the standard for judgment
as a matter of law.  See <u>Chapman</u>, 229 F.3d at 1025, n.11.

22

## V.  Discussion

As earlier noted, plaintiff's complaint alleges that
defendant is liable under Title VII and Section 1981 for
allegedly failing to promote plaintiff because of his race and
discriminating against him with respect to job assignments. (See
Complaint.) Plaintiff also alleges that defendant violated the
FMLA when they sent plaintiff a letter about his absences and
suspended him without pay. (See id.)  Generally, defendant's
motion asserts that plaintiff's complaint is due to be dismissed
because no genuine issue of material fact exists and defendant is
entitled to judgment as a matter of law.  (See Def.'s Mot. Summ.
J.)

### A. Disparate Treatment – Failure to Promote

Plaintiff alleges disparate treatment based on promotion and
job assignment. Generally, plaintiff asserts that defendant
failed to promote him because of his race and discriminated
against him with respect to his job assignments and other terms
and conditions of employment because of his race.  (See Pl.'s
Brief at 1-2, 8-19.) Specifically, plaintiff alleges he was
denied two promotions because of his race.[26]  (See id. at 1-2, 6-
10.)  Defendant argues that it is entitled to summary judgment as

---

[26] Although the move from Team Member to Team Leader is
considered a promotion, the move from Team Member to Step-Up team
leader may not be a per se promotion. However, for purposes of
this opinion, the court will refer to this event as a denial of
promotion.

23

to plaintiff's disparate treatment claims because plaintiff
cannot establish a prima facie case, or, in the alternative,
because plaintiff is unable to rebut defendant's legitimate
nondiscriminatory reasons for the employment actions at issue.

In order to prevail on a discriminatory failure to promote
claim, the plaintiff must establish a prima facie case of race
discrimination by showing the following: (1) he is a member of a
protected class; (2) he was qualified and applied for the
promotion; (3) he was rejected despite his qualifications; and
(4) other equally or less qualified employees who were not
members of the protected class were promoted.  See Alexander v.
Fulton County, Ga., 207 F.3d 1303, 1339 (11th Cir. 2000) (citing
Taylor v. Runyon, 175 F.3d 861, 866 (11th Cir. 1999).  Again,
once the plaintiff has made out the prima facie case of
discrimination, the employer must articulate some legitimate,
nondiscriminatory reason for the employee's rejection.  See id.
(citing Wu v. Thomas, 847 F.2d 1480, 1483-84 (11th Cir. 1988).
If the employer meets this burden of production, the plaintiff
must then establish that the defendant's proffered reasons for
promoting another instead of plaintiff were pretextual.  See id.

A subjective reason is a legally sufficient, legitimate,
nondiscriminatory reason if the defendant articulates a clear and
reasonably specific factual basis upon which the employer based
its subjective opinion.  See Chapman, 229 F.3d at 1032.  In a

24

failure to promote case, a plaintiff cannot prove pretext by simply arguing or even by showing that she was better qualified than the person who received the position she wanted.  See Alexander, 207 F.3d at 1339.  A plaintiff must do more than merely show that the defendant's employment decisions were mistaken; rather she must show that they were in fact motivated by race.  See id.  Federal courts do not reexamine an entity's business decisions; inquiry is limited to whether the employer gave an honest explanation of its behavior.  See Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991).[27]  However, both the Supreme Court and the Eleventh Circuit have observed that evidence showing an employer hired a less qualified applicant over the plaintiff may be probative of whether the employer's proffered reason for not promoting the plaintiff was pretextual.  See Walker v. Mortham, 158 F.3d 1177, 1190 (11th Cir. 1998)("'The fact that a court may think that the employer misjudged the qualifications of the applicants does not in itself

---

[27]  "For an employer to prevail the jury need not determine that the employer was correct in its assessment of the employee's performance; it need only determine that the defendant in good faith believed plaintiff's performance to be unsatisfactory . . . ."  Elrod, 939 F.2d at 1470 (quoting Moore v. Sears, Roebuck & Co., 683 F.2d 1321, 1323 n.4 (11th Cir. 1982); see also Damon v. Fleming Supermarkets of Florida, Inc., 196 F.3d 1354, 1361 (11th Cir. 1999)(emphasizing that courts "are not in the business of adjudicating whether employment decisions are prudent or fair. Instead, our sole concern is whether unlawful discriminatory animus motivates a challenged employment decision."); EEOC v. Total System Servs., Inc., 221 F.3d 1171, 1175-76 (11th Cir. 2000).

expose him to Title VII liability, although this may be probative
of whether the employer's reasons are pretexts for
discrimination.'")(quoting <u>Burdine</u>, 450 U.S. at 258-59.)

The Eleventh Circuit has articulated the evidentiary burden
a plaintiff must meet in order to prove pretext by showing she
was more qualified than the person promoted. <u>See Cofield</u>, 267
F.3d at 1268.  The Court explained that a plaintiff cannot
establish pretext simply by showing that she is more qualified.
<u>Id.</u>  Rather, she "must adduce evidence that the disparity in
qualifications is 'so apparent as virtually to jump off the page
and slap you in the face.'" <u>Id.</u> (quoting <u>Deines v. Texas Dept. of
Protective and Reg. Servs.</u>, 164 F.3d 277, 280 (5th Cir. 1999).
Therefore, the relevant inquiry "is not to judge which employee
was more qualified, but to determine whether any disparity . . .
is so great that a reasonable fact-finder could infer that
[defendant] did not believe" that the person granted the
promotion was better qualified.  <u>Cofield</u>, 267 F.3d at 1268.

Plaintiff claims defendant denied him two different
promotions because of his race.  Specifically, he asserts he was
denied the following: (1) the Team Leader position awarded to Roy
Grose, Todd Cooley, Wayne Smelley and Jeff Morrow in January 2000
and (2) the Step-Up Team Leader Position awarded to Tim Nelson;
and he also argues he was not awarded the Pulpit Operator
position, as an assignment of light duty, because of his race.

26

The court will address each instance separately.

### 1. Team Leader Position

Plaintiff claims that he was denied the Team Leader position because of his race. (See Compl. ¶9.)  Taking the facts in the light most favorable to the plaintiff, he can succesfully establish a prima facie case of race discrimination.  It is undisputed that plaintiff is a member of a protected class and that he was rejected despite his qualifications.  It is also undisputed that white employees were given the position. Additionally, although defendant disputes this fact, plaintiff testified that he applied for the position. (See Pl.'s Depo. at 172-174.)  Therefore the court will assume plaintiff has made out his prima facie case thus shifting the burden to defendant to articulate a legitimate non-discriminatory reason for its decision.

Defendant stated that plaintiff was not awarded the position because of his lack of experience and attendance problems. (See Carver affidavit, Def. Evid. Sub. Ex. 3.; see also Wilson Depo. at ) The plaintiff had at least 4 years less experience on the job then any of the chosen Team Leaders. (See Carver Affidavit, Def. Evid. Sub. Ex. 3.)  Moreover, plaintiff admitted he had forgotten to come to shifts in the past, and admitted that attendance was an important leadership trait. (See Pl.'s Depo. at 211-12, 215.)  None of those chosen as team leaders had any

27

record of attendance problems.  (See Carver Affidavit, Def. Evid. Sub. Ex. 3.)

Plaintiff, however, claims he was better qualified than the white men selected for the role because of his AIDT training. (See Pl.'s Depo. at 182.) However, plaintiff did not know if Smelley, Grose, Cooley or Morrow ever received such training. (See id.) It is not the job of the courts to second-guess the business judgment of employers.  See Combs, 106 F.3d at 1543. While plaintiff may believe that he was more qualified for the position, without any evidence that the employment decision was motivated by race, "[i]n a failure to promote case, a plaintiff cannot prove pretext by simply showing that she was better qualified than the individual who received the position." Denney v. City of Albany, 247 F.3d 1172, 1187 (11th Cir. 2001)(quoting Lee v. GTE Florida, Inc., 226 F.3d 1249, 1253-54 (11th Cir. 2000)).  Plaintiff provided no evidence suggesting defendant's legitimate race-neutral reason was not the real reason Grose, Morrow, Cooley and Smelley were chosen instead of plaintiff. See Alexander, 207 F.3d at 1339 (stating "plaintiff must show not only that the defendant's employment decisions were mistaken but that they were in fact motivated by race.") Moreover, the evidence that plaintiff might be more qualified than Grose, Cooley, Morrow and Smelley is far from being so apparent or virtually to jump off the page and slap you in the face.  See

28

Cofield, 267 F.3d at 1268.   Therefore, plaintiff cannot

establish his evidentiary burden and this claim fails as a matter

of law.

### 2.  Step-Up Team Leader Position

Plaintiff also alleges that he was denied the Step-Up Team

Leader position given to Tim Nelson because of his race.[28]

Assuming plaintiff can establish a prima facie case,[29] defendant

articulated a legitimate, non-discriminatory reason for awarding

Nelson the position.   Jeff Morrow, the decisionmaker,[30] stated

that he chose Nelson because of his superior attendance record

and his sole reason for not choosing plaintiff was because of

plaintiff's attendance problems.   (See Morrow Affidavit, Def.

Evid. Sub. Ex. 12.)

In response, plaintiff claims he was more qualified because

he had more seniority than Nelson. (See Pl.'s Brief at 11.)

However, plaintiff has produced no evidence of those higher

---

[28] However, plaintiff stated in a sworn charge to NLRB that
he was denied the step-up position because of his work with
unions, not because of race. (See Def. Evid. Sub. Ex. 13.)

[29] Defendant does not dispute that plaintiff met his prima
facie case. He is a member of a protected class, was qualified
for the position, was rejected, and a white male ultimately
filled the position.   Plaintiff requested this position. (See
Pl.'s Depo. at 198.)

[30] Under plaintiff's point of view, Aubrey Wilson made the
final decision. (See Pl.'s Depo. at 208.) The evidence, however,
shows Jeff Morrow made the decision of awarding Step-Up Team
Leader. (See Wilson Depo. at 139; see also Morrow affidavit, Def.
Evid. Sub. Ex. 12.)

qualifications.  The statement by plaintiff that he is more
qualified than Tim Nelson is far from being so apparent or
virtually to jump off the page and slap you in the face.  See
Cofield, 267 F.3d at 1268.  As stated above, without any evidence
that the employment decision was motivated by race, "[i]n a
failure to promote case, a plaintiff cannot prove pretext by
simply showing that she was better qualified than the individual
who received the position."  Denney, 247 F.3d at 1187 (quoting
Lee, 226 F.3d at 1253-54).  Plaintiff provided no evidence
suggesting defendant's legitimate race-neutral reason was not the
real reason Nelson was awarded the job instead of plaintiff.  See
Alexander, 207 F.3d at 1339.  Therefore, plaintiff cannot
establish his evidentiary burden and this claim fails as a matter
of law.

### 3.  Light Duty Assignment

Plaintiff also alleges that after he sustained a serious
head injury, he was not given the pulpit operator position as his
light duty assignment solely because of his race. (See Pl.'s
Depo. at 275-276.) Plaintiff claims that two white employees,
Brian Matthews and Mike Brown, were injured on the job and were
assigned to the pulpit operator position as their light duty
assignment. (See id. at 272-273.) Plaintiff, however, has failed
to make out a prima facie case.

Under McDonnell Douglas, a plaintiff establishes a prima

facie case of race discrimination under Title VII by showing:(1) he belongs to a racial minority; (2) he was subjected to adverse job action; (3) his employer treated similarly situated employees outside his classification more favorably; and (4) he was qualified to do the job. See McDonnell Douglas Corp., 411 U.S. at 802; Coutu v. Martin City Bd. of County Commissioners, 47 F.3d 1068, 1073 (11th Cir. 1995.); Turnes v. Amsouth Bank, N.A., 36 F.3d 1057, 1060 (11th Cir.1994.). See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993). It is undisputed that plaintiff belongs to a racial minority and the court will assume for purposes of this opinion only that not being assigned the particular light duty work desired constitutes an "adverse employment action." However, even with these assumptions, plaintiff has failed to establish the last two elements of his prima facie case.

Plaintiff has not produced any evidence that defendant treated similarly situated white employees more favorably. To make a comparison of the plaintiff's treatment to that of non-minority employees, the plaintiff must show that he and the employees are similarly situated in all relevant aspects. See Reno, 115 F.3d at 1562 (citing Smith v. Stratus Computer, Inc., 40 F.3d 11, 17 (1st Cir. 1994.)(emphasis added); Mitchell v. Toledo Hospital, 964 F.2d 577, 583 (6th Cir.1992); Smith v. Monsanto Chemical Co., 770 F.2d 719, 723 (8th Cir.1985.), cert.

denied, 475 U.S. 1050. "In determining whether employees are
similarly situated for purposes of establishing a prima facie
case, it is necessary to consider whether the employees are
involved in or accused of the same or similar conduct and are
disciplined in different ways. *If a plaintiff fails to show the
existence of a similarly situated employee, summary judgement is
appropriate where no other evidence of discrimination is
present.*" Reno, 115 F.3d at 1562 (emphasis in original.)

     Plaintiff compares himself to two others who were awarded
the position after suffering their injuries.  However these two
are not similarly situated employees. First, plaintiff's injury
was a head injury that was so severe that his doctor declared him
unable to work on four separate occasions and diagnosed plaintiff
with positional vertigo, which was symptomatic of plaintiff's
complaints of dizziness. (See Medical Records, Def. Evid. Sub.
Ex.5-11.) The other employees against whom plaintiff compares his
injuries, Mike Brown and Brian Matthews, had nothing remotely
close to the serious head injury as did plaintiff. (See Medical
Records of Mike Brown and Brian Matthews, Def. Evid. Sub. Ex. 3.)
Mike Brown's injury was a broken foot and Brian Matthews had a
back injury. Neither compare to plaintiff's head contusion with
serious dizziness. (See Medical Records of Mike Brown and Brian
Matthews, Def. Evid. Sub. Ex. 3.)

     Additionally, plaintiff has not established that he was even

qualified for the position of pulpit operator.  The dangers
inherent to a steel mill are so obvious and that the very mention
of a mill conjures images of molten metal, fire, and gaseous
explosion.  Plaintiff admitted that the pulpit operator position
requires the utmost alertness since the position requires
monitoring the mold water levels and the slightest deviation
could lead to death. (See Pl.'s Depo. at 73.)  Plaintiff has
failed to show that he was capable of safely performing the
position despite the serious side effects of his head injury,
namely dizziness and positional vertigo.  There is absolutely no
evidence, and plaintiff has presented nothing, that would even
infer the assignment of light duty was race-motivated.
Therefore, plaintiff cannot establish his evidentiary burden and
this claim fails as a matter of law.

### 4.  FMLA Claim

Plaintiff's final claim is that he was terminated in
violation of the FMLA. (See Compl. ¶19.) This claim is due to be
dismissed for, among other reasons, the simple fact that it is
completely false and frivolous. On the date the complaint was
filed in this court, December 4, 2001, plaintiff was still
employed by Tuscaloosa Steel. (See Pl.'s Depo. at 22.)  In fact,
as of July 29, 2002, the date of plaintiff's deposition,
plaintiff has continued to work at Tuscaloosa Steel and has never
been terminated from his employment. (See id.) There is no

evidence that plaintiff was ever terminated from Tuscaloosa Steel, much less any evidence that implicates he was terminated in violation of the FMLA.

However, in plaintiff's opposition brief, he alleges that a letter sent by Human Resources Manager Andrew Carver which threatened termination was harassment and in violation of the FMLA. (See Pl.'s Opp. Brief at 15.) Moreover, plaintiff also alleges in his opposition brief that he was denied a bonus because he took leave and this denial was a violation of the FMLA. (See id. at 18.)  Finally, plaintiff also claims in his opposition brief that he was suspended for two days, without pay, because he used FMLA leave. (See id.)  Giving plaintiff a huge benefit of the doubt, the court will interpret the letter, the denial of bonus and the suspension as FMLA retaliation.

When evaluating a FMLA retaliation claim, the court uses the burden shifting analysis set out in McDonnell Douglas. See Smith v. Bellsouth Telecommunications, 273 F.3d 1303, 1314 (11th Cir. 2001.) To establish a prima facie case of retaliation, plaintiff must show (1) he engaged in statutorily protected conduct; (2) he suffered adverse action and (3) there is a causal connection between the protected conduct and the adverse action. Id.  As noted, plaintiff must first prove that he was engaged in statutorily protected conduct. Plaintiff admitted that he never applied for leave under the FMLA. (See Pl.'s Depo. at 337.)

34

Although an employee need not expressly apply for FMLA leave, or even mention the FMLA to invoke such leave, the employee is required to notify the employer that leave is needed. See 29 C.F.R. §825.303(b)(stating an employee taking unforeseeable leave need not "expressly assert rights under the FMLA or even mention the FMLA, but may only state that leave is needed.")(emphasis added).  To engage in statutorily protected conduct, plaintiff is required to show that he met the notice requirements and actually notified his employer that leave was necessary. See Strickland v. Water Works Board of City of B'ham, 239 F.3d 1199 (11th Cir. 2001)

The facts clearly show that from at least August 15, 2001 to August 21, 2001 plaintiff did not come to work nor call his employer to notify them of his absence.  (See Pl.'s Depo. at 237-38.)[31]   Furthermore, plaintiff does not dispute that he did receive a copy of the employee handbook which required him to keep his manager informed of any continuous absence and a requirement to call in at least two hours before missing a scheduled shift. (See id. at 243.)

Under the FMLA, an employee is to notify his employer of a need for FMLA leave when foreseeable; if such leave is not

---

[31] The plaintiff was absent from work until at least September 24, 2001, although plaintiff contends that he did call in at least by August 22, 2002 or that his physician's statement should have sufficed as notice. (See Pl.'s Evid. Sub. Ex. 8, Either way, plaintiff does not and cannot dispute that he did not come to work and did not call in between August 15, 2001 and August 21, 2001.

foreseeable, plaintiff must notify his employment as soon as practicable.   <u>See</u> 29. C.F.R. §825.303-.312.   Plaintiff's absence from work was foreseeable and his ability to inform them of his immediate absence was more than practicable.

Plaintiff never contends that he was unable to make a phone call and report to management because of his injury or that his injury prevented him from having a friend or parent call the management for him. In fact, plaintiff was well aware of his inability to come to work on August 15, since Dr. Scott diagnosed him as unable to work starting August 15, 2001. (<u>See</u> Pl.'s Evid. Sub. Ex. 6.)   Hence, plaintiff's absence from work was clearly foreseeable.   <u>See</u> 29 C.F.R. §825.303-.312.   Rather, plaintiff did not call Tuscaloosa Steel, his employer, and tell them he would not show up for work because he " didn't feel like calling everyday." (<u>See</u> Pl.'s Depo. at 236.)   Unfortunately, for the plaintiff, the world tends to revolve around rules and his disdain for informing his employer of his absence will not be rewarded with a successful FMLA claim.

The letter sent by Tuscaloosa Steel did not terminate plaintiff's employment; it demanded that he call his HR manager and graciously gave him a week to make the call without voluntarily resigning his position. (<u>See</u> Def. Evid. Sub. Ex. 3.) After making this call, plaintiff returned to work in November, where he was suspended from work for two days for failing to

36

follow the company guidelines on calling before missing a shift
and not notifying his employer of the duration of his absence.
(See Pl.'s Evid. Sub. Ex. 8.) The court finds no FMLA violation
in the HR manager sending a letter to demand plaintiff call and
let his employer know if plaintiff plans to return to employment.

Plaintiff's second theory of recovery under the FMLA is
based on the substantive FMLA right to reinstatement; an employee
returning from covered leave is entitled to be restored to his
former position or its equivalent. See 29 U.S.C. §2614(a)(1).
Plaintiff claims that upon returning to work in November, he was
suspended for two days and was denied a bonus for using FMLA
leave. (See Pl.'s Opposition Brief at 18.) Once again, this is a
retaliation claim that requires analysis under the McDonnell
Douglas test.

First, even assuming plaintiff was engaged in statutorily
protected conduct, plaintiff fails to meet the third prong of the
test-causation. See Strickland, 239 F.3d at 1207-8. (holding that
plaintiff failed to produce any affidavits or any other evidence
that would permit a jury to find plaintiff was terminated for
using FMLA leave.)  To maintain a successful FMLA claim,
plaintiff must prove that the decision to suspend him for two
days and to deny him a bonus was related to his FMLA leave and no
other reason.  Plaintiff cannot meet this burden.

It is undisputed that plaintiff was suspended for two days

37

for failing to follow company guidelines and calling to announce
his absence from work. (See Pl.'s Evid. Sub. Ex. 8.)  Defendant's
August 30th letter clearly explained to plaintiff that he had
missed numerous days of work and must call in to notify defendant
of his intent to return to work or voluntarily resign. (See Def.
Evid. Sub. Ex. 3.)  Plaintiff testified that he did not call into
work at least between August 15, 2001 and August 21, 2001, in
violation of company policy.  Plaintiff's discipline sheet lists
the only reason for plaintiff's suspension as a failure to call
into work. (See Pl.'s Evid. Sub. Ex. 8.)  Simply stated,
plaintiff was disciplined for skipping work and not calling in
sick, not for taking FMLA leave and plaintiff can produce no
evidence to the contrary.

     Second, as for the denial of bonus, plaintiff must show that
he was entitled to the bonus had he not taken any leave. See 29
U.S.C. 2614(a)(3)(qualifying the right to reinstatement so that
an employee returning from FMLA leave is not entitled to "any
right, benefit, or position of employment other than any...to
which the employee would have been entitled had the employee not
taken the leave.") Under the defendant's bonus policy, employees
are given year-end bonuses based on the remainder of their unused
sick leave.  (See Pl. Evid. Sub. Ex.4, pg.28.) Plaintiff was not
entitled to the bonus, regardless of his FMLA leave, since he was
absent from work without notice from August 15, 2001 to August

21, 2001.  Without any notice of the reason for his absence, this
leave was considered sick leave and thus placed plaintiff outside
the list of bonus-eligible employees. (See Pl. Evid. Sub. Ex. 4,
pg. 28.) Since plaintiff would not have been eligible for a
bonus, regardless of his FMLA leave, plaintiff cannot make out a
prima facie case of retaliation.

### VI.  Conclusion

In summary, the court finds that the plaintiff has failed to
establish his claim of failure to promote under Title VII and 42
U.S.C. § 1981 for the positions of Team Leader, Step-Up team
Leader and Light Duty.  In addition, he has failed to show that
Tuscaloosa Steel violated the FMLA by sending him a letter
demanding that plaintiff call and notify his employer of the
duration of his absence.   No material issues of fact remain with
respect to those claims and defendant Tuscaloosa Steel is
entitled to judgment as a matter of law with respect to those
claims.  Accordingly, defendant's motion for summary judgment is
due to be granted as to those claims and a separate judgment will
be entered in favor of defendant with regard to those claims.


DONE this _27th_ day of May, 2003.



_____
SENIOR UNITED STATES DISTRICT JUDGE

39